# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# MIDLAND DIVISION

| | |
|---|---|
| In re: | § § § |
| RED FORK (USA) INVESTMENTS, INC. | § CASE NO. 18-70116 § § |
| EASTOK PIPELINE, LLC, | § CASE NO. 18-70117 § |
| Debtors. | § CHAPTER 11 § § |
| | § (Joint Administration Requested) |

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY
## OF THOMAS GOODRICH, SENIOR VICE PRESIDENT OF TREY RESOURCES, INC.
## IN SUPPORT OF FIRST DAY MOTIONS

1. I am Thomas Goodrich of Trey Resources, Inc. ("Trey Resources"). I am a Senior Vice President of Trey Resources, Inc. Since December of 2014, Trey Resources, via a Services and Operating Agreement, has been managing the operations of Red Fork (USA) Investments, Inc. ("Red Fork") and EastOK Pipeline, LLC ("EastOK") (collectively, the "Debtors").[1]

2. In my capacity as Senior Vice President of Trey Resources, I am familiar with the day-to-day operations, business affairs, and books and records of the Debtors.

3. To minimize the immediate adverse effects on the Debtors of filing for Chapter 11 protection and to enhance the Debtors' prospects of a successful reorganization, the Debtors are filing a number of motions requesting various types of "first day" relief (collectively,

---

[1] For the sake of simplicity, the term "Debtors" will be used without regard to a particular debtor entity throughout this pleading where such use would not render an inaccuracy. Where further clarification is necessary, the name of the individual entity or entities will be used.

the "First Day Motions"). I am familiar with the contents of each First Day Motion (including the exhibits and other attachments thereto), and I believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in Chapter 11 with minimum disruption or loss of productivity or value; (ii) is critical to the Debtors' achievement of a successful reorganization; and (iii) best serves the Debtors' estates and the interests of the Debtors' creditors.

4. I submit this Unsworn Declaration (the "Declaration") in support of the First Day Motions.[2] Except as otherwise indicated, all statements set forth in this affidavit are based upon: (i) my personal knowledge, (ii) documents and other information prepared or collected by members of Trey Resources or the Debtors' management, their employees, or their professionals, (iii) my review of relevant documents, and/or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtors and Trey Resources.

5. Part I of this Declaration describes the Debtors' businesses, capital structure, and the circumstances surrounding the commencement of these Chapter 11 cases. Part II sets forth the relevant facts in support of each First Day Motion.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

2

4833-0692-9775.4
900500\030073
08/07/2018 5:02 PM

# PART I

## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

### A. Background

6. The Debtors commenced these cases by each filing a voluntary petition on August 7, 2018 (the "Petition Date"). The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession.

### B. Description of the Debtors

7. Red Fork is an oil and gas exploration and production company. Red Fork has approximately 38,000 acres leased in Pawnee, Noble, Payne, Kay and Wagoner counties in Oklahoma. Trey Resources, the group operating the Red Fork assets, is headquartered in Midland, Texas. EastOK is a wholly owned affiliate. EastOK is the owner and/or operator of infrastructure including pipelines and salt water disposal wells ("SWDs") located on some the same leased acreage as Red Fork. EastOK also has its headquarters in Midland, Texas.

### C. Overview of the Debtors' Business

8. The Debtors have two officers – Eugene I. Davis who is the President and Lois Mannon who was recently appointed as Corporate Secretary.

9. For the first three months of 2018, the Debtors had a negative EBITDA of $702,444.

10. As of December 2014, the Debtors were parties to a Services and Operating Agreement (the "SOA") with Trey Resources. Pursuant to the SOA, Trey Resources was engaged as an independent contractor to provide certain services (as more particularly described in the SOA), including operational support related to the Debtors' operated and non-operated Oil and Gas Interests, engineering support, accounting support, reporting, operating and maintaining

3

the Debtors' gathering, storage and transportation of hydrocarbons, lease administration, obtaining and maintaining insurance, obtaining any necessary bonds, and compliance with all laws applicable to the operation of the Debtors' oil and gas interests. Trey Resources is also the operator of record on all hydrocarbon producing properties where Red Fork has the right to designate the operator. EastOK is the operator of all SWDs.

11. Pursuant to the SOA, the Debtors pay Trey Resources a Service Fee of $10,000 a month. The Debtors also pay a "Labor Fee" at various contractual rates for professionals, including Project Engineers, Project Geologists, Management, Land and Legal, Technicians, Administrative, and other personnel to the extent of "work actually and necessary performed". The Debtors also reimburse Trey Resources for actual Business Expenses, as defined in the SOA. As operator, Trey Resources is paid Joint Interest Billings ("JIBs") in the ordinary course of business to cover ongoing expenses incurred in operating the Debtors' assets.

12. Trey Resources is reimbursed from revenue generated from operations. If revenues from the Debtors' operations are insufficient to pay all amounts owed to Trey Resources, additional funding has historically been provided by the Prepetition Lenders (as hereinafter defined).

13. Trey Resources and the Debtors have agreed that at all times the Debtors will maintain at least $150,000 in Red Fork's debtor-in-possession account as additional assurance for payment of all obligations due and owing to Trey Resources under the SOA. Trey Resources and the Debtor have also agreed that twice a month, the Debtors will advance to Trey Resources an amount equal to the estimated expenses which will be payable in the following fifteen (15) day period.

14. Prior to the Petition Date, the Debtors' intent was to maintain their interests in mineral lease acreage and undeveloped mineral interests and develop a multi-year drilling inventory. The Debtors' original business strategy was growth-oriented – with the goal to discover, develop and/or acquire more reserves on an annual basis than are produced. The decline in commodity prices, significant operational disruptions and litigation expenses have forced a change in this strategy. Debtors are now seeking to sell some or all of their assets to a potential purchaser with the ability to pursue development of the Debtors' existing leases.

15. The Debtors have two primary producing areas.

   A. <u>Big River</u> – The Big River producing area is in Noble, Payne and Pawnee Counties. The Debtors own oil and gas leases and have all or a portion of the working interest in approximately 33,000 acres that over lie the formations Woodford and Mississippi.

   B. <u>Wagoner</u>: The Wagoner producing area is in Wagoner County. The Debtors own oil and gas leases and have all or a portion of the working interest in approximately 5,000 acres. The Wagoner wells are characterized as gas-heavy vertical wells.

### D. **Debtors' Liabilities**

16. Red Fork's estimated liabilities as of the Petition Date (exclusive of accrued and unpaid interest and other accrued liabilities), are as follows:

| Creditor Class | Approx. Amount |
|---|---|
| Prepetition Long Term Debt | $119,500,000 |
| Asset Retirement Obligations | $ 1,000,000 |
| Accounts and Notes Payable[3] | $ 1,200,000 |
| **TOTAL:** | **$121,700,000** |

### E. The Debtors' Relationship with Their Secured Creditors

17. *Prepetition Credit Facility.* Pursuant to that certain Amended and Restated Credit Agreement dated as of February 10, 2015 (as amended, restated, supplemented or otherwise modified from time to time, together with all exhibits thereto, the "Credit Agreement") among Red Fork, as borrower, the lenders from time to time party to the Credit Agreement (the "Prepetition Lenders"), and Guggenheim Corporate Funding, LLC, as administrative agent and collateral agent for the Prepetition Lenders (in such capacity, the "Prepetition Agent"), the Prepetition Lenders made certain loans and advances to Red Fork pursuant to and in accordance with the terms and conditions of the Credit Agreement (collectively, the "Loans"). It is my understanding based on information relayed by the Creditors that EastOK and Prairie Gas Gathering, LLC (collectively, the "Guarantors) unconditionally, absolutely and irrevocably guaranteed the payment and performance of all Secured Obligations (as such term is defined in the Credit Agreement) arising under the Credit Agreement and the other Indebtedness Documents (as hereinafter defined).[4]

18. *Prepetition Obligations.* As of the Petition Date, the Debtors were indebted to the Prepetition Agent and Prepetition Lenders under the Indebtedness Documents, without defense, counterclaim, offset, claim, or cause of action of any kind, in the aggregate principal amount of not less than $119,500,000 plus (a) accrued but unpaid interest (including Prepetition default interest), (b) fees and charges, plus (c) all other fees, expenses, charges and other amounts due

---

[3] This is a current estimate and not an admission of any liability as to any account or note payable.
[4] Prairie Gas Gathering, LLC was dissolved in April 2017 and is not a debtor in these Cases.

6

under the Credit Agreement and the other Indebtedness Documents (including, without limitation, attorneys' fees, consultant fees, and related expenses and disbursements that are chargeable or reimbursable under the Indebtedness Documents), and all other Obligations owing under the Indebtedness Documents as of the Petition Date (collectively, the "Prepetition Obligations").

F. **Events Leading up to the Chapter 11 Filings**

19. Beginning in 2015, the Debtors undertook to settle or resolve approximately $10 million in aged trade payables incurred under the prior management of Red For. In connection with this process, the Prepetition Lenders advanced funds to the Debtors sufficient to resolve over $9,000,000 in trade debt.

20. During 2017 and 2018, however, Debtors experienced substantial difficulties in meeting short-term cash needs, necessitating additional advances from the Prepetition Lenders. Volatility in energy prices hindered the Debtors' ability to raise debt and/or equity capital. The Debtors examined alternatives to improve liquidity and cash resources, including seeking additional short and long-term capital through bank borrowings, the issuance of debt instruments, the sale of assets, joint-venture financing, and restructuring of existing obligations.

21. Beginning October 2016, EastOK was served as a defendant in 5 lawsuits, including two proposed class actions (collectively, the "Prepetition Litigation") asserting that EastOK owned and/or operated one or more saltwater disposal wells which "caused or contributed" to certain earthquakes. In general, the Prepetition Litigation alleges that deep injections by EastOK and multiple other parties into the Arbuckle Group Formation caused earthquakes. Below is a summary of the Prepetition Litigation:

7

| STYLE | COURT | DATE FILED |
|---|---|---|
| Lacheverjuan Bennett, et al. vs. Chaparral Energy, L.L.C., et al., Cause No. CJ-2018-58 | District Court for Logan County, Oklahoma | March 26, 2018<br><br>This action is current stayed in favor of the West v. Chaparral Energy, LLC pending in the United States District Court for the Western District of Texas. |
| James Binkley, et al. v. White Star Petroleum, LLC, et al., Cause No. CJ-2017-44 | District Court for Osage County, Oklahoma | February 22, 2017 |
| Butler, et al. v. Berexco LLC et al., Cause No. CJ-2017-469 | District Court for Payne County, Oklahoma | October 13, 2017<br><br>This action is current stayed in favor of the West v. Chaparral Energy, LLC pending in the United States District Court for the Western District of Texas. |
| Griggs, et al. v. New Dominion LLC, et al., Cause No. CJ-2017-174 (Punitive Class Action) | District Court of Logan County, Oklahoma – Remanded from the United States District Court for Western District of Texas | July 21, 2017<br><br>This action is current stayed in favor of the West v. Chaparral Energy, LLC pending in the United States District Court for the Western District of Texas. |
| West, et al. v. Chaparral Energy, LLC, et al., Cause No. CIV-16-00264-F (Punitive Class Action) | United States District Court for Western District of Oklahoma – Removed from District Court of Pottawatomie, County, Oklahoma | March 18, 2016 |

22. Defending this litigation has cost the Debtors almost $170,000 to date and there is no end in sight. In a similar suit against New Dominion, the Court granted class action status to residents and business owners in 9 counties.[5]

23. The Debtors determined that they could no longer operate outside of Chapter 11 and commenced these cases on the Petition Date.

## PART II

## FIRST DAY MOTIONS

A. **Emergency Motion For Interim And Final Orders Pursuant To 11 U.S.C. Sections 105, 361, 362, 363, 364 And 507 And Federal Rules Of Bankruptcy Procedure 2002, 4001 And 9014 Authorizing (I) Interim Order (I) Authorizing The Use Of Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363 And 507, (III) Modifying The Automatic Stay Pursuant To 11 U.S.C. § 362, (IV) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(B), And (V) Granting Related Relief**

24. By the *Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507 and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (I) Authorizing the Debtors to Incur Postpetition Senior Secured Superpriority Indebtedness; (II) Authorizing Use of Cash Collateral; (III) Granting Security Interests and Superpriority Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Scheduling a Final Hearing on the Motion* (the "Cash Collateral Motion"), the Debtors seek authorization to use Cash Collateral.

25. The Debtors have determined that it is necessary to use cash collateral for the Debtors to operate their business in Chapter 11. In addition to day-to-day operations, certain expenditures related to leasehold maintenance must be undertaken to protect the value of the

---

[5] https://stateimpact.npr.org/oklahoma/2018/05/22/judge-approves-class-action-status-for-earthquake-lawsuit-against-oil-company/

4833-0692-9775.4
900500\030073
08/07/2018 5:02 PM

Bankruptcy Estates. The ability to use Cash Collateral will also allow the Debtors to provide assurances to Trey Resources and other service providers, vendors, suppliers and customers.

26. The use of cash collateral is required to preserve and to prevent deterioration of the value of the Bankruptcy Estates, through lease maintenance and protection of valuable reserves. To accomplish these goals, the Debtors must pay delay rentals, make bonus payments for lease extensions, ratifications and renewals, pay shut-in royalties. All of these actions are necessary under the terms of various leases and/or other agreements to maintain them in full force and effect and/or to meet continuous drilling commitments under the leases. The Cash Collateral will be used to accomplish these goals. Without the use of the Cash Collateral, the Debtors will not be unable to maintain their assets.

27. Although each oil and gas lease is unique according to the individual terms contained therein, there are certain commonalities among oil and gas leases relating to rights and obligations of the oil and gas lessee or operator vis-à-vis the owner of the mineral estate ("lessor"). Generally speaking, a lease has a fixed primary term and the potentiality of infinite duration as long as oil or gas is produced from the lands covered by the lease. The lease typically calls for the payment of upfront consideration (known as a "bonus"), payment for the right, but not the obligation, to drill during the primary term ("delay rentals"), royalty payments representing a fraction of production or shut-in payments for those wells that have been drilled and are capable of producing, but have been shut-in for a certain reason (such as lack of a pipeline), in exchange for the right to explore for and produce minerals. Should a lessee or operator fail to meet its obligations under the lease or a contractual arrangement, as described above, there are two potential results. The first is liability for contract damages, as occurs when a lessee or operator breaches a covenant (in most cases, failure to properly pay royalties, for

10

example, is a breach of covenant). The second result, however, is the termination of a lease or forfeiture of certain acreage thereunder, as a result of a breach of a lease *condition*. Failure to pay or to properly pay delay rentals, shut-in royalties and failure to meet continuous drilling commitments are breaches of conditions that result in the partial or complete termination of a lease. A lessee's or operator's failure to meet continuous drilling commitments usually results in the forfeiture of all leased acreage not immediately surrounding already drilled wells.

28. Though leasehold acreage is the basis for valuing an oil and gas exploration and production company, the value of the resource reserves is most often used and the best indicator of value. Reserves are those quantities of hydrocarbons anticipated to be commercially recoverable by application of development projects to known accumulations from a given date forward under defined conditions. Reserves must further satisfy four criteria: they must be discovered, recoverable, commercial and remaining (as of the evaluation date) based on the development project(s) applied. Reserves are further categorized in accordance with the level of certainty associated with the estimates – proved being the most valuable – and may be sub-classified based on project maturity and/or characterized by development and production status. From the categorization of proved reserves, the pretax future net income, discounted at 10% and commonly known as PV-10, is used as measure of present value.

29. The leasehold assets comprise a large component of the valuation of the Bankruptcy Estates. Absent the ability to use cash collateral, the Debtors stand to lose net acreage due to a failure to pay delay rentals, bonus payments for lease extensions, ratifications and renewals, and the inability to outlay the necessary expenditures for the drilling or re-entry of wells, as required by continuous drilling commitments of various leases and contractual arrangements with other working interest owners.

11

4833-0692-9775.4
900500\030073
08/07/2018 5:02 PM

30. The book value of the oil and gas properties (using the successful efforts method) is $146,594,510 (net of accumulated depreciation, depletion and amortization).

31. The Interim Budget itemizes the sources and uses of cash and provides a weekly projection of cash receipts and expenditures. The Interim Budget includes categories of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtors' businesses and maintain leases until such time as a final hearing on the Motion can be held.

32. Pursuant to the Cash Collateral Motion, Debtors seek authority to use Cash Collateral.

33. During the thirteen (13) weeks ending November 03, 2018, the Debtors are projected to receive approximately $625,000 in receipts net of Royalty and ORRI Payments. From those amounts, Debtors propose to pay the Agent all documented out-of-pocket costs and expenses (including attorney's fees) incurred by the Agent. Debtors do not propose to pay any interest on the Prepetition Debt. Severance taxes are estimated at approximately $45,000. The Debtors also estimate that during the same period, they will incur approximately $975,000 in net joint interest billings. The Debtors also estimate that during the same period, they will incur approximately $365,000 in billings associated with general & administrative (non-bankruptcy related) costs relating to continued operation of the Debtors' assets. Debtors propose to pay $1,385,000 in post-petition expenses related to taxes, joint interest billings and general & administrative-related costs, which are necessary in order to continue to receive oil and gas receipts. Absent the use of Cash Collateral, the Debtors will have no ability to operate.

34. The Debtors require immediate use of Cash Collateral, including cash proceeds, to continue the operation of their businesses. Without such funds, the Debtors will not be able to

12

pay costs and expenses, including, but not limited to, salaries, rent, general and administrative operating expenses, lease operating expenses and maintenance costs, that arise in the administration of these Cases and in the ordinary course of the Debtors' businesses.

35. Absent the ability to use Cash Collateral, the Debtors will be forced to try and find a source of additional loans or shut down all of their operations abruptly, which will negatively impact the value of their assets and eliminate any prospect distributions to unsecured creditors. The Debtors further believe that an abrupt shutdown will result in a severe and dramatic loss of collateral value.

36. The Debtors request interim authorization to use Cash Collateral as set forth in the Interim Budget (attached hereto as Exhibit "A") until a final order granting further use of cash collateral can be entered. The Debtors are without sufficient funds, other than Cash Collateral, to operate until a final hearing on this Motion can be held. The Debtors' inability to timely pay the costs and expenses set forth herein will result in immediate and irreparable harm to their assets.

37. On an interim basis, the Debtors request that this Court authorize the Debtors to use up to $650,000 through the end of September 2018. The Debtors must have the interim relief requested in order to operate their business.

38. The Debtors have advised that it proposes to provide adequate protection to the Prepetition lenders as follows:

    a. The Agent will receive their reasonable fees and expenses.

    b. The Agent will receive replacement liens.

    c. The Agent will receive superpriority liens to the extent such lender is able to demonstrate a diminution in value.

4833-0692-9775.4
900500\030073
08/07/2018 5:02 PM

## B. Motion for Order Granting Additional Time to File Schedules and Statements

39. By the *Debtors' Motion for Order Granting Additional Time to File Schedules and Statements,* the Debtors seek an extension of the time allotted under the Federal Rules of Bankruptcy Procedures for filing their schedules of assets and liabilities (the "Schedules") and statement of financial affairs (the "Statements").

40. There are over 1000 creditors and parties-in-interest in these cases. In addition, the Debtors operate their business from various locations. Given the size and complexity of the Debtors' business, staffing limitations of Trey Resources personnel working on Debtors' matters, the Debtors have not had the opportunity to gather the necessary information to prepare and file their respective Schedules and Statements.

41. Further, the efforts of Trey Resources' employees, on behalf of the Debtor, during the initial postpetition period are critical, and the Debtors must devote their time and attention to business operations during the first critical weeks of these Cases in order to maximize the value of their estates.

42. I currently anticipate that a period ending forty-five (45) days after the date of the bankruptcy filing will be sufficient for the Debtors to file their bankruptcy Schedules and Statements.

## C. Emergency Motion for Order (I) Deeming Utilities Adequately Assured of Future Performance, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Establishing Procedures for Determining Adequate Assurance Combined with Notice of Opportunity of Hearing

43. The Debtors have filed the *Emergency Motion for Order (I) Deeming Utilities Adequately Assured of Future Performance, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Establishing Procedures for Determining Adequate Assurance Combined with Notice of Opportunity of Hearing* (the "Utilities Motion").

14

In connection with the operation of their businesses, the Debtors currently utilize utility services, primarily electricity ("Utility Services") through numerous accounts with various utility companies (collectively, the "Utilities"). The Debtors' main utility needs are to service their oil and gas wells, gas gathering system and pipelines, and other facilities.

44. On written request from any utility, the Debtors propose to establish the Utility, as adequate assurance of payment, an escrow account in an amount equal to the monthly average bill for utility service provided by each Utility Company prior to the Petition Date (with such average based on the last six month's billings from such utility) (the "Utility Escrows"). A list of the names and addresses of the Utility Companies is attached to the Utilities Motion as Exhibit A.

45. Uninterrupted utility service is essential to the Debtors' ability to operate and maintain its operations. Therefore, it is necessary for the Debtors to receive the relief requested in the Utilities Motion to avoid immediate and irreparable harm.

### D. Motion for an Order (i) Authorizing Payment of Certain Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business

46. The Debtors have filed the *Motion for Order (i) Authorizing Payment of Certain Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business* (the "Tax Motion"). The Tax Motion requests authority to pay, in the Debtors' sole discretion, sales and use taxes (the "Sales and Use Taxes"), Ad Valorem (the "Ad Valorem Taxes"), federal, state, and local severance and production taxes (the "Production Taxes"), franchise and/or income taxes (the "Franchise/Income Taxes"), and other taxes (together with the Sales and Use Taxes, Property Taxes, Production Taxes, and Franchise Taxes, the "Taxes") and/or fees ("Fees") owed or accrued Prepetition to the taxing and governmental regulatory authorities (the "Taxing and Regulatory Authorities").

4833-0692-9775.4
900500\030073
08/07/2018 5:02 PM

47. In the ordinary course of business, and as part of their operations, the Debtors incur, or collect, various Taxes, including Sales and Use Taxes, Ad Valorem Taxes, Production Taxes, Franchise Taxes and other taxes and Fees. Before the Petition Date, the Debtors generally paid all undisputed Taxes in a timely fashion.

48. Certain Taxing and Regulatory Authorities require the Debtors to collect from their customers, and/or for the Debtors to pay as a customer, Sales and Use Taxes that are based on a percentage of sales prices. In most cases, the Sales and Use Taxes are paid in arrears once collected. It is difficult for the Debtors to estimate the amount of Sales and Use Taxes owed as of the Petition Date, as such taxes are taken into account in the numerous invoices either generated by or paid by the Debtors.

49. Ad Valorem Taxes are assessed and become payable in the ordinary course of business and are calculated based on a statutorily-mandated percentage of property value (for both real and personal property). Generally, Ad Valorem Taxes are due annually. As of the Petition Date, the Debtors estimate that no Property Tax amounts are due and owing to the Taxing and Regulatory Authorities as all current Property Taxes have been paid prior to the Petition Date. However, there are Ad Valorem Taxes that are assessed but not yet paid; therefore, certain Ad Valorem may be billed during the pendency of these Cases. Debtors seek to pay those taxes.

50. Various Taxing and Regulatory Authorities also assess Production Taxes based on the Debtors' extraction of oil and gas, usually as a percentage of revenues. Production Taxes are essentially akin to a sales tax in form and effect. Because the payment of Production Taxes is directly related to the Debtors' ability to continue the extraction and sale of oil and gas, payment

16
4833-0692-9775.4
900500\030073
08/07/2018 5:02 PM

of the Production Taxes is critical to the Debtors' continued operations. Severance taxes are estimated to be $45,000 for the thirteen-week period ending November 03, 2018.

51. In addition, the Debtors have Franchise Tax obligations they must pay to various Oklahoma authorities. The Franchise Taxes are assessed annually and are necessary to remain in good standing. The Debtors request authority to continue to pay the Franchise Tax obligations if and when they become due and payable during the pendency of these Cases.

52. Certain of the Taxes or Fees collected by the Debtors from third parties are held in trust for the benefit of the Taxing and Regulatory Authorities. Thus, as to accrued Taxes and Fees of the Debtors that were unpaid as of the Petition Date, the Debtors' officers and directors could be subjected to lawsuits during the pendency of these Cases. Such lawsuits would prove extremely distracting for the Debtors and the named officers and directors, whose immediate and full-time attention is required for the Debtors' reorganization. It is in the best interest of the Debtors' estates to eliminate the possibility of such time-consuming and potentially damaging distractions.

53. Debtors submit that the payment of the Taxes and Fees is necessary to avoid potential administrative difficulties. Without such payments, the Taxing and Regulatory Authorities may file liens, conduct audits and bring motions to lift the automatic stay. Debtors believe that the payment of the Taxes and Fees will help to avoid such actions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __07__ day of August, 2018.

Thomas Goodrich
Senior Vice President of Trey Resources, Inc.

18

4833-0692-9775.3
900500\030073
08/07/2018 2:24 PM

# Exhibit "A"

Red Fork
Simplified Cash Projections

Please note figures are on a cash basis and will differ from accounting basis

| | Aug-18 Estimate | Sep-18 Estimate | Oct-18 Estimate | Nov-18 Estimate | Dec-18 Estimate | Previous 6 Month Average |
|---|---|---|---|---|---|---|
| Beginning Cash Balance (incl. Operational Carve-Out) | $10,000 | - | - | - | - | - |
| RF Revenue (Actual Cash Received Net of Production Taxes) | | | | | | |
| Crude Revenue | $115,543 | $104,694 | $184,463 | $178,730 | $181,402 | $169,273 |
| Gas Revenue | $44,767 | $68,958 | $66,291 | $64,016 | $65,191 | $54,811 |
| Total Revenue | $160,310 | $173,652 | $250,754 | $242,746 | $246,592 | $224,084 |
| RF Expenses | | | | | | |
| LOE (incl. cash portion of SWD expense) | ($125,000) | ($256,912) | ($368,655) | ($256,399) | ($256,142) | ($216,205) |
| Workover | - | ($96,498) | ($60,165) | ($40,165) | ($40,165) | ($82,677) |
| P&A | - | ($15,000) | ($30,000) | ($15,000) | - | - |
| Taxes | - | - | - | - | - | - |
| OCC Payments / Undeveloped Leasehold / Other | - | - | - | - | - | ($4,425) |
| Operating Expenses | ($125,000) | ($368,411) | ($458,820) | ($311,564) | ($296,307) | ($303,307) |
| EastOK Net Cash Flow from Pipeline Sales Less Taxes | - | - | - | - | - | $8,914 |
| EastOK Cash Portion of SWD Income | - | - | - | - | - | $30,574 |
| EastOK LOE / Workover | - | - | - | ($95,933) | - | ($81,990) |
| G&A | | | | | | |
| Trey Resources | - | ($50,000) | ($50,000) | - | - | ($91,578) |
| Other G&A | ($12,500) | - | ($10,000) | - | - | ($37,889) |
| Total G&A | ($12,500) | ($50,000) | ($60,000) | - | - | ($129,467) |
| Restructuring Expenses | | | | | | |
| Dykema | - | ($60,000) | ($60,000) | ($60,000) | - | - |
| H&B | - | ($40,000) | ($40,000) | ($40,000) | - | - |
| Utilities Deposit | ($41,902) | - | - | - | - | - |
| Funding into Operational Carve-Out | ($150,000) | - | - | - | - | - |
| Guggenheim Interest | - | - | - | - | - | ($15,777) |
| Extraordinary Items | - | - | - | - | - | ($27,892) |
| Net Cash Flow Before Funding | ($169,092) | ($344,759) | ($368,066) | ($264,750) | ($49,715) | ($239,076) |
| Guggenheim Funding | $159,092 | $344,759 | $368,066 | $264,750 | $49,715 | $178,833 |
| Ending Cash Balance | - | - | - | - | - | |
| Operational Carve-Out Fund | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | |
| Actual Net Production Sold for the Month (Cash is received ~2 months later) | Aug-18 Estimate | Sep-18 Estimate | Oct-18 Estimate | Nov-18 Estimate | Dec-18 Estimate | Previous 6 Month Average |
| Oil | 3,058 | 2,963 | 3,007 | 2,913 | 2,957 | 2,862 |
| Gas | 30,726 | 29,671 | 30,216 | 29,179 | 29,714 | 26,458 |
| Boe | 8,178 | 7,908 | 8,043 | 7,776 | 7,909 | 7,272 |
| Boepd | 264 | 264 | 259 | 259 | 255 | 240 |
| % Oil | 37% | 37% | 37% | 37% | 37% | 39% |